IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JEROME McFALL, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 06-778 |
| | ) | Judge Joy Flowers Conti/ |
| MICHAEL J. ASTRUE,[1] Commissioner | ) | Magistrate Judge Amy Reynolds Hay |
| of Social Security, | ) | |
| Defendant. | ) | |

REPORT AND RECOMMENDATION

I.      RECOMMENDATION

It is respectfully submitted that the Motion for Summary Judgment filed by

Plaintiff [Dkt. No. 9] be denied.  It is further recommended that the Motion for Summary

Judgment filed by Defendant [Dkt. No. 14] be granted and that the decision of the Commissioner

denying Plaintiff's application for disability insurance benefits be affirmed.

II.     REPORT

A.      **Procedural History**

Plaintiff, Jerome McFall, brought this action under 42 U.S.C. § 405(g), seeking

review of the Commissioner of Social Security's final decision disallowing his claim for

disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II

and XVI of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-433, 1381-1383f.

---

[1]      Under Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue, who
became the Commissioner of Social Security on February 12, 2007, is properly
substituted as the named defendant for prior Commissioner Jo Anne B. Barnhart, and
interim Acting Commissioner Linda S. McMahon.

In his application for benefits filed in 2003, Plaintiff claimed an onset of disability of July 3, 2003 (Tr. 87-89). The state agency denied his claims on February 27, 2004, and on March 26, 2004, Plaintiff requested a hearing before an administrative law judge ("ALJ") (Tr. 77-78).

A hearing was held on August 11, 2005, at which time Plaintiff, who was represented by counsel, and a vocational expert ("VE") were called to testify (Tr. 38-69). The ALJ issued a decision on January 17, 2006 (Tr. 13-28), finding that Plaintiff is capable not only of returning to his past relevant work but of performing a significant range of sedentary work that exists in the national economy and, thus, is not disabled as defined under the Act (Tr. 26). The Appeals Council denied Plaintiff's request for review on April 17, 2006, making the ALJ's decision the final decision of the Commissioner (Tr. 7-10).

### B.    Factual Background

Plaintiff was born on February 5, 1964, and, thus, was 41 years old at the time of the hearing (Tr. 42). Plaintiff is a high school graduate and has previously worked delivering Schwan's food, driving railroaders to the trains and as a sanitation engineer (Tr. 49-50). Plaintiff was also a telemarketer for Reese Brothers, where he was also a supervisor, and  most recently worked delivering medication to nursing homes (Tr. 49, 50). Plaintiff has not worked since July of 2003, when he was in an accident while coming home from work (Tr. 47, 49).

C.      **Medical History**[2]

1. Before July 2004

Plaintiff alleges that he became disabled after a July 3, 2003 automobile accident during which he sustained pelvis, rib, and right femur fractures that were treated by Jeffrey Sewecke, M. D., of Allegheny Orthopedic Associates (Tr. 229-36, 263-66).

During a July 22, 2003 office visit, Plaintiff reported that he was "doing very well" but had left leg pain and paresthesias (Tr. 236).  Plaintiff had grossly intact sensation and normal left extremity plantar sensation, but dorsiflexion was absent.  His knee flexion and extension was intact and his hip flexion was present, but limited by pain (Tr. 236).

Plaintiff's August 2003 examination revealed leg strength of 5/5 in the right and 4/5 in the left quadricep and hamstring strength of 5/5 (Tr. 234).  Plaintiff also had "satisfactory" knee range of motion "without discomfort" (Tr. 234).  Dr. Sewecke stated that Plaintiff reported dorsal aspect foot paresthesias, but examination showed no evidence of sensory loss in the superficial plantar distribution (Tr. 234).  Plaintiff was to begin weight bearing as tolerated on both lower extremities (Tr. 234).

Dr. Sewecke ordered physical therapy and the initial evaluation showed full 5/5 upper extremity strength but problems with lower extremities (Tr. 240).  On September 12, 2003, physical therapy notes indicate that Plaintiff was ambulating 275 feet (x2) with a walker and continuing to improve on a daily basis (Tr. 237).  Plaintiff reported left hip pain increasing at night to 8-9/10, but decreasing to 0-2/10 the next day, and typical pain with exercise was at

---

[2]      The recitation of Plaintiff's medical history has been taken almost verbatim from defendant's brief which not only accurately reflects the evidence of record but is wholly undisputed.

4-5/10 at most (Tr. 237).  On September 16, 2003, treatment notes indicate that Plaintiff reported "doing well" (Tr. 231).  Plaintiff was "ambulating approximately 400 [feet] in physical therapy" (Tr. 231).  Dr. Sewecke's examination revealed satisfactory healing and no pain with range of motion (Tr. 231).  Plaintiff had deep and superficial peroneal nerve sensation, but also a lack of left foot dorsiflexion (Tr. 231).  Further, Plaintiff's x-ray showed progressive healing and no significant displacement from the previous fracture (Tr. 231).  Dr. Sewecke opined that Plaintiff would continue to advance in weight-bearing as tolerated (Tr. 231).  On September 24, 2003, Plaintiff was ambulating "2 x 500" feet with breaks in between and walking up and down stairs (Tr. 246).  Plaintiff reported that, although he had to concentrate on locking his knee, he also played pool (Tr. 246).  Subsequent notes through October 3, 2003 show no complaints and that Plaintiff was ambulating some distance as well as using a hand rail up and down stairs (Tr. 246).

In October 2003, Plaintiff saw Dr. Sewecke after he sustained a fall (Tr. 230).  Plaintiff had trochanteric tenderness, but no pain or tenderness with hip range of motion (Tr. 230).  Plaintiff now had full 5/5 left and right quadricep lower extremity strength (Tr. 234) and his peroneal nerve sensation was intact (Tr. 230).  Dr. Sewecke again opined that Plaintiff was progressing well with no new injury sustained from the fall (Tr. 230).  He stated that Plaintiff should continue to advance his activities as tolerated (Tr. 230).

On February 24, 2004, state agency consultant Frank Bryan, M.D., assessed Plaintiff's functioning as of July 3, 2004, (Tr. 282), one year after the car accident.  No treating source statement was in the record (Tr. 279).  Dr. Bryan did review Dr. Sewecke's treatment notes indicating that Plaintiff was healing well (Tr. 281).  He also noted Dr. Sewecke's

4

uncertainty as to why Plaintiff was complaining of knee pain (Tr. 281) and Plaintiff's activities of daily living (Tr. 282).  In Dr. Bryan's opinion, Plaintiff would be expected to ambulate without his brace and there was no evidence that Plaintiff's knee condition would not respond to treatment (Tr. 282).  In reviewing the medical evidence, Dr. Bryan opined that Plaintiff could ambulate effectively without a walker, crutches, or a cane for at least two hours a day by July 3, 2004 (Tr. 282), one year after the injury.  Dr. Bryan also opined that Plaintiff could perform light exertional level work standing and/or walking at least two hours in an eight-hour work day and sitting about six hours in an eight-hour work day (Tr. 274).

2. After July 2004

Plaintiff requested a medical source statement from Dr. Sewecke.  On November 2, 2004, Dr. Sewecke completed a Medical Questionnaire submitted by Plaintiff's counsel (Tr. 283-85).  Dr. Sewecke opined that Plaintiff had fractures, based upon x-rays, that did result in lower extremity pain and other symptoms, but did not disturb Plaintiff's sleep (Tr. 284).  He did not explain the frequency, duration, or severity of Plaintiff's symptoms (Tr. 284).  He did explain that Plaintiff used a cane[3] (Tr. 284A), and need not elevate his legs during the day (Tr. 284) .

Dr. Sewecke opined that Plaintiff could occasionally and frequently lift twenty pounds (Tr. 284A).  He could stand for two hours and for one hour without interruption (Tr. 284A).  He could sit for three hours and one hour without interruption (Tr. 284A).  Dr. Sewecke opined that Plaintiff had no hand restrictions (Tr. 284A).

---

[3]      Plaintiff's counsel provided Dr. Sewecke with a definition for "inability to ambulate effectively," which included use of a hand held device that limited the functioning of both upper extremities such that an impairment seriously interferes with the individual's ability to independently initiate, sustain, or complete activities or insufficient lower extremity functioning (Tr. 285).

The form also asked Dr. Sewecke to opine whether Plaintiff could work on a regular and continuous basis during an eight-hour day (Tr. 284B).  It appears that Dr. Sewecke initially indicated "yes," but then indicated "no" and failed to explain his medical reasons for either response (Tr. 284B).  He later checked two other boxes on the form indicating that Plaintiff would miss one day and/or two days of work in an average month (Tr. 284B).  In providing the requested "medical bases," Dr. Sewecke wrote "arthritis" and "severity of the injury" (Tr. 284B).  He did state that Plaintiff had no currently prescribed medication side effects (Tr. 284B).

The ALJ found that the evidence supported a finding that, as of the twelve-month period after the July 3, 2003 accident, Plaintiff retained the RFC to perform work at the light exertional level (Tr. 25).

A December 10, 2004 chest x-ray showed no active pulmonary filtrates, normal cardiomediastinal silhouette and unremarkable bony structures (Tr. 323).  The diagnostic impression was a normal radiographic study (Tr. 323).

Roberto Bendoni, M.D., treated Plaintiff from May 2004 through March 2005 (Tr. 347-361), primarily for diabetes.  His treatment notes reflect that Plaintiff was morbidly obese (Tr. 353), with a body-mass index of 45.  He enrolled Plaintiff in a weight reduction program (Tr. 348, 357) and put him on a diet (Tr. 352-53).  Dr. Bendoni noted that Plaintiff walked with a cane since his car accident (Tr. 360).  On March 29, 2005, Dr. Bendoni treated Plaintiff for a toe infection (Tr. 348).  Other treatment notes show that Plaintiff did relatively well (Tr. 353) and that his examinations were unremarkable (Tr. 350).

Dr. Bendoni's records show that Plaintiff had shoulder surgery but did well thereafter (Tr. 354). An MRI previously showed tendon tears, joint effusion, and small spur (Tr. 375). Thomas B. Hughes, M.D., repaired the shoulder injury and Plaintiff reported having "minimal pain" and "mild pain with heavy lifting" four months afterwards (Tr. 377). According to Dr. Hughes' November 2004 report, Plaintiff was "doing incredibly well," had reached maximum medical improvement, and did not need to continue therapy (Tr. 377).

Christopher Enoch, D.O. examined Plaintiff in November 2004 for his proteinuria and noted that Plaintiff weighed 315 pounds (Tr. 382, 384). Dr. Enoch opined that Plaintiff's blood pressure, hyperlipidemia and diabetes mellitus were under control (Tr. 382, 384, 385). Plaintiff had left foot drop, but full 5/5 power in his lower extremities (Tr. 384). Dr. Enoch recommended weight loss (Tr. 385).

In April 2005, Dr. Enoch reexamined Plaintiff for diabetes treatment, noting that Plaintiff was morbidly obese at 329 pounds (Tr. 378-79). Plaintiff reported no acute complaints, including no chest pain, shortness of breath, lower extremity edema, or leg pain (Tr. 378). Plaintiff stated that he tolerated his medications well and was not in any distress (Tr. 378). Dr. Enoch's examination noted that Plaintiff had a foot drop but his extremities showed no edema and full 5/5 power (Tr. 379).

Plaintiff saw Lewis Kline, M.D. for sleep apnea/hypopnea syndrome in April 2005 (Tr. 302-304). With Bipap inspiratory and expiratory pressure, Dr. Kline reported that Plaintiff had good resolution of his sleep disorder noting that Plaintiff reported that he slept "much better than usual" (Tr. 303). Dr. Kline noted Plaintiff's body mass index of 45, and stated that serious attention to weight reduction may be worthwhile (Tr. 303).

On May 26, 2005, Plaintiff had surgery for his right hydrocele (Tr. 330, 333-34). His physical review noted that he did not have shortness of breath (Tr. 330). He did not have neuromuscular deficits (Tr. 330) or motor or sensory loss (Tr. 331). Plaintiff's extremities showed no phlebitis or edema, and good pulses and muscle development (Tr. 331).

William J. Fernan, Ph.D., completed a psychological examination in June 2005 (Tr. 339-46). Plaintiff's drive to the examination (presumably while seated) was forty-five minutes (Tr. 339). Dr. Fernan noted that Plaintiff had a significant left leg limp (Tr. 339). He did not mention a cane. Plaintiff reported a severe "drop foot" requiring a brace and imposing difficulties negotiating steps (Tr. 340). Also, Plaintiff said that he could not sit or stand for "any length of time" (Tr. 340). Plaintiff stated that he accomplished things 15-20 minutes at a time (Tr. 340). Most of the time he tinkered around the house and in the garage (Tr. 340-41). He could cook, manage his finances, and clean on a gradual basis (Tr. 340). Plaintiff also visited with friends and friends reciprocated (Tr. 340). He said that his shoulder remained weak with limited range of motion and that he could not carry anything (Tr. 340). He later stated that he could carry light groceries and laundry (Tr. 340).

Mentally, Plaintiff reported "mild to severe" depression (Tr. 340). Dr. Fernan opined that Plaintiff experienced no significant anxiety (Tr. 343). In his opinion, Plaintiff would have mild difficulty refraining from focusing on his physical problems (Tr. 344). Plaintiff's global assessment of functioning was 70[4] and his primary diagnosis was depressive disorder, not

---

[4]     A GAF score of up to seventy indicates that a person has some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functions pretty well, and has some meaningful interpersonal relationships while a score of seventy-one to eighty indicates that if symptoms are present, they are transient and expectable reactions to psycho social stressors; no more than slight impairment in social,

otherwise specified (Tr. 343).  Plaintiff could not understand, remember and carry out detailed or complex tasks, but was not precluded from performing simple job instructions (Tr. 346).

### D.    Hearing Testimony and ALJ Decision

At the administrative hearing, Plaintiff testified that he was born on February 5, 1964, and, thus, was 41 years old at the time (Tr. 42).  Plaintiff testified that he was divorced and lived alone, that he graduated from high school and that he has no trouble reading or writing or doing simple math (Tr. 42-43).  Plaintiff also indicated that he was 5'10" and weighed 320 pounds but that he had only been at that weight for about a year and that it was not his normal weight (Tr. 43).  Plaintiff said that he had gained weight because he could not get around and be active and that he is unable to work because of the pain in the lower half of his body, including his hips and right leg (Tr. 43, 47).  In addition, plaintiff testified that he also has a drop foot and cannot walk without a brace and that he has to lie down and take the weight off his legs sometimes because the pain is excruciating (Tr. 43, 47).  As well, plaintiff testified that he had a bad shoulder from the accident, which prevents him from carrying or lifting anything, and that he had rotator cuff surgery but that it still locks into place some times (Tr. 44).  Plaintiff allowed that he is presently on public assistance (Tr. 47).

It also appears that plaintiff suffers from diabetes which causes neuropathy in his hands and feet but which, according to Plaintiff, he can control when he is eating and taking his medication properly (Tr. 44, 46).  Plaintiff also has neuropathy in his left leg because of nerve

---

occupational, or school functioning.  Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th ed. 1994).

damage from the accident and has urinary incontinence which he attributes to both the accident and the diabetes (Tr. 45-46).

Plaintiff also testified that although he takes Wellbutrin he still has problems with depression but that he was not seeing a counselor or psychiatrist at the time and has never been hospitalized because of it (Tr. 48).  Plaintiff indicated that he believes the Wellbutrin gives him headaches for which he takes Advil but does not believe that he has any other side effects from his medications (Tr. 48-49).

Plaintiff also indicated that he had worked delivering medical needs to nursing homes for four to six months before he had the accident (Tr. 49).  Before that, he delivered Schwan food for six to eight months, drove railroaders to the trains for a year and a half, did telecommunication work at Reese Brothers for approximately three years, and was a sanitation engineer for about three years (Tr. 49-50).

Further, plaintiff testified that he does not do any yard work and very little housework but does cook and wash the dishes and that he sometimes watches TV, plays cards and goes to the stock car races (Tr. 51).  Plaintiff also testified that he used to shoot pool, played football and rode bicycles with his children but no longer does, and that his friend's children vacuum, sweep and take out the trash for him (Tr. 51-52).  Plaintiff allowed that he goes to the grocery store once a week, but is only able to carry packages of five to ten pounds without it hurting his lower extremities; that he visits friends but does not drive, although he has a driver's license; and that he is able to dress and bathe himself without any help (Tr. 52- 53).

Plaintiff also testified that he goes to bed between 10:00 p.m. and 11:00 p.m., gets up around 9:00 a.m. and, although he suffers from sleep apnea, he sleeps with a mask on that

allows him to breathe (Tr. 53).  As well, according to plaintiff's testimony, he does not take walks during the day because of the pain that he has and that he is only able to sit or stand for fifteen or twenty minutes because of the pressure on his hips and then he has to go lie down (Tr. 53).  Plaintiff indicated that he lies down during the day two or three times and that when he does take an actual nap it is for an hour or an hour and a half (Tr. 54).  Plaintiff testified that although he can pick up small objects such as a coin from a table, he has numbness in his hands, having "had carpel tunnel done on both of them;" that when he reaches over his head and does any pulling his shoulder pinches; and that he has problems with balance because of his left leg (Tr. 54-55).  Plaintiff also indicated that he had been getting dizzy spells which he thinks may be related to his sugar levels and that when it gets extremely hot out he can barely breath and uses Albuterol every for to six hours (Tr. 55).

In addition, plaintiff testified that he smokes a pack of cigarettes a day and that he has trouble remembering phone numbers, doctor appointments, his childrens' birthdays and what he reads and has to write things down (Tr. 56).  When asked by the ALJ how he felt about life in general, he replied that he felt hopeless and was without energy as things had gone down hill the past two years (Tr. 56).  Plaintiff also told the ALJ that he has pain in his right hip joint and on his left side toward the back of his hip in the pelvic area, and numbness and pain from the knee down to his toes and in his right shoulder (Tr. 56-57).  Plaintiff described the pain as sharp and constant and testified that the severity depended on how active he is during the day and that lying down and putting his legs up was the only thing that gave him any relief (Tr. 57).  Plaintiff further testified that he had physical therapy for about a year after the accident which "got [him] up walking," albeit with a cane and a brace, but that "things are getting sore and arthritis is

11

setting in," and that his family doctor, Doctor Bendoni, said that he is totally disabled because he is unable to move around (Tr. 57-58).  As well, plaintiff indicated that Dr. Enoch, who he sees for his liver and kidneys, said that his kidneys are getting worse (Tr. 58).  When asked whether he had ever been told by his doctors to avoid or limit certain things, Plaintiff replied only that Dr. Sewecke told him that if he lifted something that was too heavy to put it down (Tr. 59).  He also allowed that no doctor had ever mentioned anything about sending him to a specialist or trying a treatment that they hadn't done before and that there was no change in his treatment at the time of the hearing (Tr. 59).

Upon examination by his attorney, Plaintiff testified that after his accident he had a broken pelvis which is now held together by eight plates and hinges and screws; that he has plates and screws in his left hip and a rod that goes up into his hip area; that he has a ground bar in place of his right femur, which he broke in five places, and two screws holding it onto his knee; and that he has another rod going up into his right hip to hold that into place, all of which are permanent (Tr. 60).  Plaintiff stated that the last time he saw Dr. Sewecke, who did the surgeries on his legs and hips, was November of 2004, and that he was no longer seeing Dr. Sewecke because he said there was no more he could do for Plaintiff (Tr. 59-60).  Plaintiff also stated that even with his cane he is only able to walk thirty to forty feet, very slowly, before he has to sit down and is unable to walk over uneven terrain (Tr. 60-61).  As well, plaintiff indicated that he is unable to make it through the day without lying down two or three times and that several times a week he has to lie down more often (Tr. 61).  Plaintiff testified that, as arthritis is setting in, he thinks that his condition and the pain is getting worse but told the ALJ that he

doesn't take any prescription medications for the pain, using only Advil instead, because he doesn't want to get hooked on anything (Tr. 62).

Although not entirely clear from the transcript, Plaintiff also testified to having "caught" a disease at the office of Dr. Scott, who was apparently treating Plaintiff for diabetes, which is causing the bone in his left leg to deteriorate (Tr. 62). Plaintiff also indicated that he has to get up two or three times during the night to use the bathroom because of his urinary problems and that he also has sexual problems as the result of his condition (Tr. 62-63).

Plaintiff further indicated that he did not believe he could do the work as a telemarketer now because he would have to sit down and because he gets tired and has to lie down because of the pain (Tr. 63).

A VE was also called to testify at the hearing and categorized Plaintiff's past work as a garbage collector at the very heavy exertional level and unskilled, that his previous driver jobs were at the low end of semi-skilled and at the medium exertional level and that his job as a telemarketer was also at the low end of semi-skilled and at the sedentary exertional level (Tr. 64). In response to a hypothetical question involving a forty-one year old individual with a twelfth grade education who is able to perform sedentary work but is unable to lift or carry more that ten pounds, must have a sit/stand option, would have limitations on pushing and pulling in his upper extremities and in his ability to bend, crouch, kneel, squat, climb and walk, which he must do with the assistance of a cane at all times, who would need to "make comfort positions," and would have limitations on his ability to follow detailed instructions, the VE testified that such an individual could perform work such as telemarketer, citing to the fact that many firms not only allow you to sit and stand at your discretion but some actually prefer that you stand and walk.

13

The VE also stated that such an individual could work as an interviewer and information clerk and that all these positions exists in significant numbers in the national economy (Tr. 65-66).  In response to questioning by Plaintiff's counsel, the VE allowed that an individual who could only stand or walk for a total of two hours and only sit for a total of three hours in an eight hour day, would not be able to work on a full-time basis (Tr. 66).  In addition, if the individual's ability to concentrate was rated poor or if they had no ability precluding them from performing even simple repetitive tasks on an on-going basis, the VE testified that such an individual would not be able to work (Tr. 67-68).

Based on this evidence the ALJ found that although Plaintiff suffered from severe impairments, they did not meet or equal the criteria of a listed impairment in 20 C.F.R. § 404.1520(d) and 416.920(d) (Tr. 18).  The ALJ also found that despite limitations on his ability to lift more than ten pounds, his ability to push and pull with his lower extremities, and his ability to bend, stoop, crouch, squat, climb, balance, kneel, walk and his exposure to humidity, dust, fumes, chemicals, gasses as well as limitations in making complex decisions and understanding and following detailed instructions, Plaintiff had the residual functional capacity to perform some work at the sedentary level that existed in the national economy and, thus, was not disabled (Tr. 22, 28).

### E.    Standard of Review

Presently before the Court are the parties' cross-motions for summary judgment. In reviewing the administrative determination by the Commissioner, the question before the court is whether the Commissioner's decision is supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Smith v. Califano, 637 F.2d 968, 970

14

(3d Cir. 1981).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Kangas v. Bowen, 823 F.2d 775, 777 (3d Cir. 1987).  Substantial evidence is defined as less than a preponderance and more than a mere scintilla.  Perales, 402 U.S. at 402.  If supported by substantial evidence, the Commissioner's decision must be affirmed.  Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).

A five-step process is used to determine disability eligibility.  See 20 C.F.R. §§ 404.1520(a) and 416.920(a).[5]  Here, the ALJ determined that Plaintiff was not disabled at the fourth and, alternatively, the fifth step, finding that Plaintiff was capable of returning to his past work as a telemarketer and that the Commissioner had nevertheless met his burden of proving that, considering Plaintiff's residual functional capacity ("RFC"),[6] age, education, and past work experience, he could perform work that exists in significant numbers in the regional or national economy.  42 U.S.C. §§ 404.1560(c) and 416.960(c).  See Bowen v. Yuckert, 482 U.S. 137, 146 n. 5 (1987); Sykes v. Apfel, 228 F.3d 259, 263 (3d Cir. 2000).

**F.   Discussion**

To support his position that the ALJ's decision is not supported by substantial evidence Plaintiff makes essentially three arguments.  First, Plaintiff argues that the ALJ erred by failing to properly consider his obesity and its effect on his other impairments as required under

---

[5]   The five-step sequential evaluation process for disability claims requires the Commissioner to consider whether a claimant: (1) is working, (2) has a severe impairment, (3) has an impairment that meets or equals the requirements of a listed impairment, (4) can return to his past relevant work, and (5) if not, whether he can perform any other work in the national economy.  Id.

[6]   A claimant's "residual functional capacity" is what he can do despite the limitations caused by his impairments.  Fargnoli v. Massanari, 247 F.3d 34, 40 (3d Cir. 2001).

15

Social Security Ruling ("SSR") 02-01p in determining whether his impairments meet or equal a listed impairment at the third step of the sequential process.

It appears undisputed that SSR 02-01p provides that:

Because there is no listing for obesity, we will find that an individual with obesity "meets" the requirements of a listing if he or she has another impairment that, by itself, meets the requirements of a listing.  We will also find that a listing is met if there is an impairment that, in combination with obesity, meets the requirements of a listing.  For example, obesity may increase the severity of coexisting or related impairments to the extent that the combination of impairments meets the requirements of a listing.  This is especially true of musculoskeletal, respiratory, and cardiovascular impairments.  It may also be true for other coexisting or related impairments including mental disorders.

*     *     *

An assessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment.

SSR 02-01p.  See Przegon v. Barnhart, 2006 WL 562966 *4 (E.D. Pa. March 6, 2006).  Thus, as found by the United States District Court for the Eastern District of Pennsylvania, the ruling "simply requires the ALJ to take plaintiff's obesity into account" regardless of whether the plaintiff has documented obesity-related limitations.  Id.

Here, at the close of the hearing, the ALJ was asked by Plaintiff's counsel to consider the evidence in light of SSR 02-01p, arguing that Plaintiff's extreme level of obesity in combination with his difficulty walking and ambulating effectively suggests that he equals the listed impairments (Tr. 68-69).  The ALJ took note of the request and in her decision, while discussing whether Plaintiff had an impairment or combination of impairments which meet or equal one of the listed impairments at the third step of the evaluation process, indicated that she

"also considered the effects of the claimant's weight under Social Security Ruling 02-01p, in the sequential evaluation process as it relates in combination with [his] other diagnoses and [his] overall level of functioning" and concluded that, although some of Plaintiff's symptoms are severe, they are "not severe enough to meet or medically equal one of the impairments listed ...." (Tr. 21-22).  The ALJ also took note of the medical evidence of record that reported Plaintiff's obesity, specifically referring to Dr. Enoch's progress notes and the report from Drs. Kline and Sunseri in which they documented Plaintiff's obesity and his need to lose weight (Tr. 21, 23, 24). Moreover, the ALJ expressly stated that she gave some weight to the medical evidence from Dr. Bendoni whose notes repeatedly reference Plaintiff's obesity and that they were enrolling Plaintiff in a weight loss program (Tr. 24, 348, 350, 352, 353, 357).  Having considered the medical evidence documenting Plaintiff's obesity and having expressly stated that she considered the effects of the claimant's weight under Social Security Ruling 02-01p, it appears that the ALJ properly considered Plaintiff's obesity as a factor in determining whether Plaintiff's impairments met or equaled a listed impairment.

Plaintiff nevertheless cites to three cases form the Eastern District of Pennsylvania which he argues require the Court to remand this case to the Commissioner so that a proper assessment of Plaintiff's obesity and its effect on his impairments can be performed.  These cases, however, are easily distinguishable.

In Przegon v. Barnhart, 2006 WL 562966 (E.D. Pa. March 6, 2006), and Morris v. Barnhart, 2004 WL 1238397 (E.D. Pa. May 10, 2004), for instance, the question before the Court was whether the record regarding Plaintiff's obesity had been fully developed in the first instance and not whether the ALJ properly assessed the evidence that was before the Court.  Indeed, in

17

Przegon, the plaintiff had testified at the hearing regarding her obesity and the effect it had on her physical limitations yet the ALJ never ordered her to undergo a physical examination.[7]  The Magistrate Judge found that record was insufficient to make any kind of assessment of Plaintiff's obesity and recommended that the case be remanded -- a finding which the District Court approved and adopted.

In the instant case, however, although plaintiff indicted at the hearing that he was 5'10" tall and weighed 320 pounds, when asked by the ALJ why, in his own words, he believed he is unable to work, Plaintiff did not mention his weight as a contributing factor or otherwise testify regarding the effect his obesity had on his physical limitations (Tr. 43-55).  Moreover, Plaintiff has not challenged the sufficiency of the record evidence with respect to his obesity but contends only that the ALJ did not set forth her analysis of how Plaintiff's obesity factored into her decision with the requisite specificity.

As well, in  Morris v. Barnhart, 2004 WL 1238397 * 4 (E.D. Pa. May 10, 2004), and Caballero v, Barnhart, 2003 WL 22594256 *6 (E.D. Pa. September 29, 2003), upon which Plaintiff also relies, the cases turned on the fact that the ALJ gave no indication in his decision that the claimant's obesity was considered at all.  Here, however, the ALJ specifically stated in her decision that she had considered the effects of Plaintiff's weight under SSR 02-01p in the sequential evaluation process as it relates in combination with his other diagnoses and overall functioning.

---

[7]     Although it appears clear that there were no reports of obesity-related physical limitations, it is not clear from the memorandum whether any of the medical evidence even documented the plaintiff's obesity.  Id.

Moreover, as argued by the Commissioner, the Third Circuit's opinion in Rutherford v. Barnhart, 399 F.3d 546 (3d Cir. 2005), appears to be dispositive of the issue. There, the plaintiff, much like the instant Plaintiff, argued that remand was required because the ALJ erred by failing to consider her weight in determining whether she was disabled as SSR 02-01p mandates given the fact that the medical records indicated that she was 5'2" and weighed approximately 245 pounds.  Id. at 552.  The Court held that remand was not required, however, citing  to the fact that Rutherford never mentioned obesity as a condition that contributed to her inability to work even when asked by the ALJ, and had not specified how her obesity would effect the analysis other than to assert that her weight makes it more difficult to stand, walk and manipulate her hands and fingers.  Id. at 553.  Further, the Court found that the ALJ had satisfactorily considered Rutherford's obesity as a factor, albeit indirectly, given that her doctors had to be aware of her obvious obesity and that the ALJ relied on the medical evidence as a basis for his findings regarding Rutherford's limitations and impairments.  Id.

Although the instant Plaintiff indicated that he had gained weight because it was difficult to get around, like in Rutherford, he did not mention his obesity as a factor when asked why he believed he was unable to work nor has he specified how his obesity would effect the analysis.  Moreover, the ALJ not only painstakingly reviewed the medical evidence which repeatedly documented Plaintiff's obesity, but she expressly stated that she had taken Plaintiff's weight into consideration.  Thus, under Rutherford, remand is not required.  See Balanian v. Barnhart, 2005 WL 2886215 *3  (E.D. Pa. November 1, 2005) (Finding that, under Rutherford, remand was not required where the plaintiff did not testify that her weight was a problem and her doctor's did not suggest that her weight contributed to her ailments).

We also note that Plaintiff has taken issue with the portion of the ALJ's report in which she states that Dr. Sewecke, a treating physician, indicated that Plaintiff could perform work at the light exertional level (Tr. 23).  Plaintiff contends that because Dr. Sewecke found that Plaintiff could only stand or walk for two hours and only sit for three hours in an eight hour work day, which Plaintiff describes as "not even full-time work," the ALJ's finding that Plaintiff could perform light work is a misrepresentation of the record.  See Pl.'s Brief, p. 18.

Review of the ALJ's report, however, demonstrates that the ALJ based her statement that Plaintiff could perform light work on Dr. Sewecke's opinion that Plaintiff could lift up to twenty pounds and not his ability to sit, stand, or walk (Tr. 23, 284A).  Indeed, being able to lift twenty pounds occasionally is consistent with the physical exertion requirements for light work, which Plaintiff does not dispute.  See 20 C.F.R. §§ 404.1567(b) and 416.967(b) (2005).  Moreover, the ALJ limited Plaintiff to sedentary work.  Thus, Dr. Sewecke's finding that Plaintiff was capable of lifting 20 pounds on occasion cannot provide the basis for finding that the ALJ's conclusion that Plaintiff could lift ten pounds occasionally is unsupported by substantial evidence.

Further, although Dr. Sewecke indicated on the Medical Questionnaire he completed in November of 2004 that, in his opinion, Plaintiff was not capable of working on a "regular and continuing basis," i.e., eight hours a day, five days a week, and would need to miss work one or two days a month due to his medical condition or treatment, he provided no explanation for his conclusion and the only "medical basis" he provided to support his opinion was to list "arthritis," which he did not list as a medical diagnosis, and "severity of injury" (Tr. 284, 284B).  The absence of any explanation or elaboration renders his opinion in this regard

20

suspect.  See Mason v. Shalala, 994 F.2d 1058, 1065 (3d Cir. 1993) (Finding that a report in the nature of a form where the physician need only check a box or fill in a blank is "weak evidence at best"); Brewster v. Heckler, 786 F.2d 581, 585 (3d Cir. 1986) (Finding that the reliability of a RCF report unaccompanied by a written report is suspect).

Moreover, the ALJ is not required to accept the medical opinion of a treating physician that is conclusory and unsupported by other medical evidence.  Jones v. Sullivan, 954 F.2d 125, 129 (3d Cir. 1991).  See 20 C.F.R. § 404.1527 (2005).  In addition, it is well established that an ALJ may rely on the opinions of non-examining physicians, even when those opinions contradict the opinion of a treating physician, if the opinions are consistent with the record.  Id.

Here, Dr. Bryan reviewed Dr. Sewecke's treatment notes which, as previously discussed, indicated that Plaintiff was healing well (Tr. 281).  Dr. Bryan noted Dr. Sewecke's uncertainty as to why Plaintiff was complaining of knee pain (Tr. 281) and Plaintiff's activities of daily living and found that there was no evidence that Plaintiff's knee condition would not respond to treatment (Tr. 282).  Dr. Bryan concluded that Plaintiff could ambulate effectively without a walker, crutches, or a cane for at least two hours a day within twelve months of Plaintiff's accident or the alleged onset of disability (Tr. 282), and that Plaintiff could perform light exertional level work standing and/or walking at least two hours in an eight-hour work day and sitting about six hours in an eight-hour work day (Tr. 274).  Indeed, Plaintiff does not dispute the ALJ's finding that the medical evidence from Dr. Sewecke does not demonstrate the level of severity of symptoms that would be disabling twelve months after Plaintiff's onset date (Tr. 25).  As such, it appears that the ALJ's decision is supported by substantial evidence.

Plaintiff next contends that the ALJ erred by not specifically stating a time frame within which Plaintiff is able to sit and stand in contravention to SSR 83-12 and SSR 96-9p. Plaintiff contends that the amount of time he is able to sit and stand is relevant to his residual functional capacity and the exertional level he is capable of performing and that because the ALJ included only a sit/stand option "at [Plaintiff's] discretion" in the hypothetical posed to the VE, in essence no limitation was imposed at all.

As found by the United States District Court for the Eastern District of Pennsylvania,

> SSR 83-12 contemplates the situation of a claimant requiring alternate sitting and standing.  The ruling does not demand that unskilled claimants who require alternate sitting and standing be deemed incapable of sedentary work. In the most extreme situation, it provides that: "[i]n cases of unusual limitation of ability to sit or stand, a VS [vocational specialist] should be consulted to clarify the implications for the occupational base."[8]

---

[8]     SSR 83-12 reads, in its entirety:

> "In some disability claims, the medical facts lead to an assessment of RFC which is compatible with the performance of either sedentary or light work except that the person must alternate periods of sitting and standing. The individual may be able to sit for a time, but must then get up and stand or walk for awhile before returning to sitting. Such an individual is not functionally capable of doing either the prolonged sitting contemplated in the definition of sedentary work (and for the relatively few light jobs which are performed primarily in a seated position) or the prolonged standing or walking contemplated for most light work. (Persons who can adjust to any need to vary sitting and standing by doing so at breaks, lunch periods, etc., would still be able to perform a defined range of work.)

> There are some jobs in the national economy-typically professional and managerial ones-in which a person can sit or stand with a degree of choice. If an individual had such a job and is still capable of performing it, or is capable of transferring work skills to such jobs, he or she would not be found disabled. However, most jobs have ongoing work processes which demand that a worker be in a certain place or posture for at least a

Adams v. Barnhart, 2004 WL 632704 *3 (E.D. Pa. January 29, 2004).  See Hall v. Barnhart,

2004 WL 632723 *6 (E.D. Pa. January 14, 2004).  As in Adams, this is precisely what occurred

in this case.  A VE was called to testify and allowed that, given the limitations in the ALJ's

hypothetical, including the sit/stand at-will option, such an individual could perform Plaintiff's

past work as a telemarketer, which he previously described as sedentary and semi-skilled (Tr. 64,

65).  The VE specifically noted Plaintiff's testimony that he could no longer work as a

telemarketer because they would not let him stand and testified that some telemarketing firms

allow you to sit/stand at your discretion and some even prefer that you walk and stand believing

that "you project your voice better and work with more energy and so forth" (Tr. 65).  As well,

the VE stated that, even discounting those places that still require constant sitting, approximately

210,000 such jobs existed nationally (Tr. 65).  In addition, the VE testified that such a person

could also perform jobs as an interviewer, of which there were in excess of 22,000 jobs

nationally; an information clerk, of which 15,546 existed nationally; and as an administrative

support person, of which 46,472 jobs existed.  It therefore appears that, contrary to Plaintiff's

assertion, the ALJ followed the requirements of SSR 83-12 by consulting a VE and taking into

consideration the fact that Plaintiff needed a sit/stand option.

   Further, SSR 96-9p requires that "when a claimant does not have the ability to do

the full range of sedentary work, the ALJ's assessment of disability should follow certain

guidelines."  Morgan v. Secretary of Health and Human Services, 2002 WL 732091 (D. Del.

---

    certain length of time to accomplish a certain task. Unskilled types of
    jobs are particularly structured so that a person cannot ordinarily sit or
    stand at-will. In cases of unusual limitation of ability to sit or stand, a VS
    should be consulted to clarify the implications for the occupational
    base."

February 13, 2002), aff'd, 49 Fed. Appx. 389 (3d Cir. 2002).  Plaintiff argues that the ALJ failed

to comply with the guideline that applies when an individual, given their particular limitations,

must alternate between sitting and standing.  In this regard, SSR 96-9p provides that:

> An individual may need to alternate the required sitting of
> sedentary work by standing (and, possibly, walking) periodically.
> Where this need cannot be accommodated by scheduled breaks and
> a lunch period, the occupational base for a full range of unskilled
> sedentary work will be eroded. The extent of the erosion will
> depend on the facts in the case record, such as the frequency of the
> need to alternate sitting and standing and the length of time needed
> to stand. The RFC assessment must be specific as to the frequency
> of the individual's need to alternate sitting and standing. It may be
> especially useful in these situations to consult a vocational resource
> in order to determine whether the individual is able to make an
> adjustment to other work.

SSR 96-9p.  Plaintiff contends that because the ALJ was not specific as to how often the

individual in her hypothetical needed to alternate sitting and standing as required under the

guideline, she in effect gave no sit/stand limitation at all and, thus, the case should be remanded.

  While it appears clear that the ALJ was not specific in her RFC assessment

regarding the frequency of Plaintiff's need to alternate sitting and standing, it does not appear,

under the circumstance presented here, that remand is required.  First, as argued by the

Commissioner, the sit/stand at-will option, while not specific, nevertheless accommodates

Plaintiff's assertion that he could not sit for the six hours at a time that is consistent with

sedentary level work.

  Moreover, it appears that the specificity requirement regarding frequency becomes

relevant only where alternating between standing and sitting cannot be accommodated.  See SSR

96-9p.  The VE testified, however, that some "telemarketing firms allow you to sit/stand at your

discretion.  In fact, some I am aware of prefer that you stand and walk" (Tr. 65).  It therefore appears that in these positions Plaintiff's limitation in this regard would be accommodated regardless of the amount of time he is able to sit or stand or how often he needs to alternate those positions.  Indeed, even if Plaintiff's testimony that he could only sit or stand for fifteen to twenty minutes at a time (Tr. 53) was credited it appears that he would still be able to perform his past work as a telemarketer.  In this manner, it does not appear, nor has Plaintiff argued, that the lack of specificity in the ALJ's hypothetical question impacted the VE's testimony or the ALJ's findings that jobs exist in the national economy that Plaintiff could perform and does not provide the basis for remand.

Finally, Plaintiff complains that, likely due to "transcription problems," the current record does not reliably describe the limitations in the hypothetical question posed to the VE and that, because the response to the hypothetical formed the basis for the ALJ's decision, it is somehow unreliable.  Plaintiff specifically refers to the portion of the hypothetical wherein the ALJ was listing potential limitations which, in the transcript, reads: "[t]he sixth [limitation] to make comfort positions, and the seventh to follow detailed instructions" (Tr. 65).

We note at the out set that Plaintiff has acknowledged that "if this were the only error identified in this case it is doubtful it would be sufficient to call the ALJ's decision into question."  Pl.'s Brief, p. 27.  Having found Plaintiff's other allegations of error are without merit, it would appear that Plaintiff has conceded that this argument does not provide the basis for remand either.

We nevertheless note that it appears fairly clear that the reference to "follow detailed instructions" in the course of listing the hypothetical individual's limitations indicates

that the person would be limited in his ability to follow detailed instructions.  Indeed, in her decision the ALJ indicated that she asked the VE to assume that the hypothetical person would be, inter alia, "limited in making complex decisions and in understanding, remembering and following detailed instructions" (Tr. 27).

While the reference to "comfort positions" is not so clear,[9] the fact that the transcript does not accurately reflect the question does not impact the reliability of the answer or whether the ALJ's ultimate findings as reflected in her subsequent decision are supported by substantial evidence.  This is particularly true here where Plaintiff does not suggest that the question actually asked at the hearing was nonsensical or that the VE's responsive testimony itself is unreliable.  Moreover, the ALJ's assessment sufficiently covers Plaintiff's credible limitations which would appear to render remand unwarranted.

Summary judgment is appropriate when there are no disputed material issues of fact, and the movant is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56; Edelman v. Commissioner of Social Sec., 83 F.3d 68, 70 (3d Cir. 1996).  In the instant case, there are no material factual issues in dispute, and it appears that the ALJ's conclusion is supported by substantial evidence.  For this reason, it is recommended that Plaintiff's motion for summary judgment be denied, that Defendant's motion for summary judgment be granted, and that the decision of the Commissioner be affirmed.

---

[9]     The ALJ has indicated her decision, however, that she also asked the VE to assume an individual who "can have no exposure to humidity, dust, fumes, chemicals and gases" (Tr. 27), which are not reflected as being asked at the hearing.  Although not at all clear, it could be inferred that the transcriber merely categorized the environmental limitations imposed by the ALJ under the broad heading of "comfort positions."

In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) & (C), and Local Rule 72.1.4 B, the parties are allowed ten (10) days from the date of service to file written objections to this report.  Any party opposing the objections shall have seven (7) days from the date of service of the objections to respond thereto.  Failure to timely file objections may constitute a waiver of any appellate rights.

Respectfully submitted,

/s/  Amy Reynolds Hay
United States Magistrate Judge

Dated: 11 June, 2007

cc:    Hon. Joy Flowers Conti
       United States District Judge

cc:    Karl E. Osterhout, Esq.
       1789 South Braddock Avenue
       Suite 570
       Pittsburgh, PA 15218

       Megan Farrell
       Assistant United States Attorney
       United States Attorneys Office
       700 Grant Street
       Suite 4000
       Pittsburgh, PA 15219